

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| GREGORY CONTE and WARREN BALOGH, | Civil Action No. 3:19-cv-00575-MHL |
| Plaintiffs, | HEARING REQUESTED |
| v. | |
| COMMONWEALTH OF VIRGINIA, TERENCE R. MCAULIFFE, VIRGINIA STATE POLICE, STEVEN FLAHERTY, BECKY CRANNIS-CURL, BRIAN JOSEPH MORAN, CITY OF CHARLOTTESVILLE, MICHAEL SIGNER, WES BELLAMY, CHARLOTTESVILLE POLICE DEPARTMENT, and AL THOMAS, JR., | |
| Defendants. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

COME NOW Plaintiffs Gregory Conte and Warren Balogh, *pro se*, and request that this Honorable Court deny Defendants' motions to dismiss for failure to state a claim (documents 10, 16, 23, 28 in docket).[1] Defendants make several arguments as to why Plaintiffs' complaint should be dismissed, all of which mischaracterize Plaintiffs' allegations or misinterpret the applicable laws and precedents. Moreover, Defendants'

---

[1] Four sets of defendants filed separate motions to dismiss this action under Rule 12(b)(6): Al Thomas, Jr. ("Thomas") (ECF Doc. Nos. 10-11); the Charlottesville Police Department ("CPD") and City of Charlottesville (collectively "City Defendants") (ECF Doc. Nos.16-17); the Commonwealth of Virginia, Virginia State Police, Terence R. McAuliffe, Brian Joseph Moran, Becky Crannis-Curl, and Steven Flaherty (collectively, "Commonwealth Defendants") (ECF Doc. Nos. 23-24); and Wes Bellamy (ECF Doc. Nos. 28-29).

arguments are facially absurd, taken *in toto*, they necessarily imply that no rights to free speech or assembly exist in the Commonwealth of Virginia.

## I. BACKGROUND

Through a process of decisions made by Defendants, Plaintiffs (and other rally-goers) were brought into an impossible situation. They had to either attempt to engage in free speech and assembly despite violent opposition from third-parties or not exercise their rights at all. Defendants brought this situation about with the knowing, tacit coordination with malicious third parties (Antifa).

Defendants argue that 1) Plaintiffs' complaint resembles those of the plaintiffs in *Turner v. Thomas* (3:17-CV-00064) and *Kessler v. City of Charlottesville* (3:19-CV-00044), 2) that Defendants had no responsibility to protect Plaintiffs' rights under the 1st and 14th Amendments 3) that Defendants are precluded from liability based on qualified immunity and 4) that UTR demonstrators were responsible for instances of violence and 5) that Plaintiffs' have not adequately stated a RICO claim.

In response, Plaintiffs contend that: 1) Plaintiffs' complaint differs substantially from those in *Turner* and *Kessler* to such a degree as to meet the Fourth Circuit's requirement of what constitutes affirmative conduct sufficient to invoke the state-created danger doctrine, 2) Defendants' allegations that UTR demonstrators were responsible for the violence are untrue and, with respect to the Plaintiffs, irrelevant, 3) The *reductio ad absurdum* of the Defendants' position is that free speech and assembly do not exist 4) Qualified immunity does not protect Defendants from liability in this case and 5) Plaintiffs' RICO claim is adequate.

# ARGUMENT

1. ## PLAINTIFFS' CIVIL RIGHTS WERE VIOLATED BY THE AFFIRMATIVE CONDUCT OF OFFICERS AND AGENTS OF THE STATE

Plaintiffs' claims differ substantially from those of *Kessler* and *Turner* in that Plaintiff's allege not that Defendants simply failed to protect them, but that they were actively hostile and oppositional. The dispositions and actions of VSP and CPD can only be interpreted as belying a plan to thwart UTR protestors from reaching Lee Park, or, failing that, to expel them from the park (cf Heaphy 159-162). These departments had every reason to anticipate antifa's general plan (cf. complaint sec. 3 "Defendants intentionally encouraged and facilitated mob violence by counter-protestors," and sec. 27, "Defendants intentionally brought UTR demonstrators and counter-protestors into direct conflict... Defendants forced them together into a restricted space."). Not only did VSP's plan fail to counter Antifa's desire to effect a Heckler's veto, but by the execution of their plan, VSP made entering Lee Park more difficult, and it was only with their force that Plaintiffs were ejected from the park.

Plaintiffs do have an absolute constitutional right to engage in first-amendment protected speech and assembly without interference or opposition from state officials, as Plaintiffs have alleged occured (cf. complaint, sec. 32 , "In the leadup to and throughout August 12, 2017, Defendants engaged in a series of acts designed to restrict UTR demonstrators from expressing specific viewpoints," sec. 33, "City and State Police positioned themselves behind barriers to the north of Market Street, restricting UTR demonstrators from entering by any means other than the Market Street entrances [where

3

antifa were positioned]," sec. 40 "VSP... formed the riot line that pushed dozens of protestors (including Plaintiffs) out of Lee Park and into Antifa, despite the fact that VSP had total control of other, safer means of exit" etc.).

Defendants rely on a subset of cases concerning the state-created danger doctrine, which arose from a series of Supreme Court decisions holding that the government has no duty to protect people from privately inflicted harms. The first among these decisions was *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). *DeShaney* concerned a four-year-old boy who was severely beaten by his father and sustained irreversible brain damage. The boy's guardian sued the Department of Social Services for failing to respond to child abuse complaints for over two years and for costing the child his liberty without due process. In an opinion by Chief Justice Rehnquist, the Court held that the Constitution does not normally create a duty by the government to protect citizens from privately inflicted harms.

Although the Court in *DeShaney* denied the existence of any general government duty to protect from harm by private actors, the majority opinion identified areas where the government *does* have a duty to provide protection. One is where the government has a person physically in custody. *Id.* at 199-200. In such a case, the government has restricted the individual's ability to protect himself and must provide protection for him. Second, and related to the first although independent from it, the government must provide protection when the government itself is responsible for creating the danger. *Id.* at 200; *see also Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to

4

say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); *Currier v. Doran*, 242 F.3d 905, 918 (10th Cir. 2001) (holding state liable for transfer of child's custody from mother to father, because the children "would not have been exposed to the dangers from their father but for the affirmative acts of the state"). Deliberate indifference or recklessness is sufficient to show liability if there is a state-created danger.

The Heaphy report, after having examined this issue, stated "The First Amendment to the United States Constitution guarantees all citizens the right to express their views in public places, however objectionable those views may be. Law enforcement is tasked with protecting that right, as well as ensuring public safety. Those values often conflict, particularly when the content of speech provokes strong, sometimes violent reactions. In the context of public demonstrations in parks and plazas, the United States Supreme Court has made clear that both protesters and counter-protesters have a constitutionally protected interest in being seen and heard. The First Amendment will similarly protect the interest of protesters and counter-protesters who seek to show one another that their message is wrong or otherwise unacceptable. Again, law enforcement must protect the safety of all participants in these events—both protesters and counter-protesters." (Heaphy, p. 65)

Plaintiffs' claim also should be regarded separately from *Kessler* because that case is ripe for appeal, and there exists a possible conflict of interest for Judge Moon. Two of the clerks who assisted Judge Norman Moon in *Kessler* (and other UTR-related cases), Hutton Marshall and Joshua Lefebvre, should have been excluded from working on the case because they are affiliates of Elizabeth Sines, a plaintiff against Jason Kessler in

5

another suit. Lefebvre might have even been a material witness to the events at issue in Plaintiffs' complaint. While Judge Moon has recently removed these clerks from all UTR-related cases, their previous involvement brings into question the soundness of the decisions in any cases (including *Kessler*) in which they were involved.

Defendants also engaged in blatant favoritism by treating counter-protestors differently from UTR protestors in the lead-up to August 12, 2017 and on the day itself. Defendant Bellamy, "encouraged attendance and personally participated in a faith-based endeavor to visibly oppose the Alt-Right event" (Heaphy, 156). The City granted permits to counter-protestors for McGuffey and Jackson Park (cf complaint, paragraph 30) and never attempted to move their demonstrations (while the City tried to move UTR to McIntyre Park). Moreover, the City knew that counter-protestors did not intend to stage demonstrations in those parks, but intended to attempt to disrupt UTR, according to Heaphy, p.77: "Heinecke [who held the permits to McGuffey and Jackson parks] met with [Special Events Coordinator Michelle] Christian and [CPD] Captain Lewis in advance of August 12, and it became clear that the true focus of the Justice and McGuffey events was to use the parks as staging areas for counter-protesters." On the day of the rally, the dispersal order was only enforced against UTR attendees in Lee Park, not against counter-protestors demonstrations at McGuffey and Jackson Park.

The disparity in treatment was noted by the Honorable Glen E. Conrad in his injunction ordering the City to let UTR proceed at Lee Park at the scheduled time (3:17CV00056, section I, paragraph 4), "The City solely revoked his permit, but left in place the permits issued to counter-protestors. The disparity in treatment between the two

6

groups with opposing views suggests that the defendants' decision to revoke Kessler's permit was based on the content of his speech rather than other neutral factors that would be equally applicable to Kessler and those protesting against him. This conclusion is bolstered by other evidence, including communications on social media indicating that members of City Council oppose Kessler's political viewpoint. At this stage of the proceedings, the evidence cited by Kessler supports the conclusion that the City's decision constitutes a content-based restriction of speech."

## 2. DEFENDANTS IMPROPERLY INTRODUCE EVIDENCE FROM HEAPHY REPORT TO BLAME PLAINTIFFS FOR VIOLENCE

Defendants argue that the Heaphy report should be deemed to be incorporated into Plaintiffs' Complaint, on the basis that Plaintiffs cite and refer to statements from the report. Plaintiffs do not object to the Court's considering the existence of the Heaphy report and the existence of the allegations therein in deciding Defendants' motions to dismiss. But Defendants go farther in attempting to cherry-pick allegations from the Heaphy report to argue that "UTR attendees initiated a series of violent tactics and engaged in mutual combat" with the violent counter-protestors who confronted them. First, these allegations about alleged actions by unidentified "UTR attendees" have nothing to do with Plaintiffs, who engaged in no illegal activities. Second, the allegations that Defendants present as fact are not properly subject to judicial notice on a motion to dismiss, because they are subject to reasonable dispute in that they are not "generally known within the territorial jurisdiction of the trial court" and not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

7

For this reason, Defendants' citations to the Heaphy report are of no help to their motions to dismiss.

However, the Court may take judicial notice of the existence of the Heaphy report, which is not subject to reasonable dispute, and of the fact that it makes the following statements regarding the involvement of specific Defendants at issue in this case -- allegations which must be accepted as true at this stage on consideration of Defendants' motions to dismiss:

- (August 2, 2017) Governor McAuliffe calls Mayor Signer and suggests certain safety measures on August 12, including legally impermissible ban on firearms; Governor tells Signer that VSP will provide list of recommendations; list never delivered. (Heaphy, 186)

- The Charlottesville City Council unduly interfered with operational planning by directing that the event be moved to McIntire Park just days in advance. (Heaphy, 155)

- CPD and VSP planners failed to follow this important rule of separation on August 12. While they spent many hours considering how to divide Emancipation Park into different areas and keep the Alt-Right protesters separate from confrontational groups, they did not sufficiently plan to protect public safety as attendees moved toward and away from Emancipation Park. The Operational Plan was fundamentally flawed in its lack of focus on areas adjacent to the park—the areas where violence predictably occurred on August 12. (p. 159)

- Despite the knowledge that people would be approaching Emancipation Park from both the east and the west along Market Street, law enforcement made no attempt to ensure separation between groups along those crucial pathways [....] Rather than protecting people along the likely routes of travel, officers were stationed in Emancipation Park, behind metal barricades. This represents a horrible misalignment of resources that left our community unprotected. (p.159)

- CPD commanders could have deployed multiple specialized units to respond to the violent skirmishes that occurred on Market Street. The CPD SWAT team was staged just blocks away in the alley next to the CPD station. (p161)

- Law enforcement failed to prevent and respond to violent confrontations in and around the park. Those in the park at the time of the unlawful assembly were pushed straight south, into the area on Market Street where counterprotesters had assembled. Predictably, violent confrontations occurred as the Unite The Right protesters streamed past the counter-protesters. [....] The inability to enforce separation during dispersal represents another planning failure. [....] CPD and VSP commanders failed to protect the points of egress, instead pushing the conflicting groups directly into each other. The violent conflicts that resulted were a predictable recurrence of what had led to the unlawful assembly. (p.162)

- Signer shared with us that Vice Mayor Wes Bellamy also had separate conversations with the Governor and Secretary of Public Safety Brian Moran, but those conversations "never went anywhere." (p.85)

### 3. DEFENDANTS' POSITION IMPLIES THAT FREEDOMS OF SPEECH AND ASSEMBLY DO NOT EXIST

Commonwealth Defendants argue that the First and Fourteenth amendments do not require the government to protect citizens from violent third parties. Thus, according to the Commonwealth's argument, free speech and assembly only exist when citizens are not opposed by violent third parties, or when citizens are willing (and able) to use superior force to defeat third-parties who seek to interfere. This raises the basic question of what are citizens supposed to do when a "third party" seeks to block them from engaging in free assembly?

The *reductio ad absurdum* of the Commonwealth Defendants' contention is that any private cartel may conspire and organize to take total control of public space, and may deny that space to citizens, and that the government has no responsibility to stop them. In effect, their position is that private gangs should be allowed to arrogate police powers to themselves, and that they should be allowed to exercise those powers to deny public space to whomever they would oppose.

Plaintiffs have alleged that Defendants enacted a plan that forced UTR demonstrators to run a gauntlet of hostile, violent third-party opposition, and then used "fighting" as a pretext to deny citizens' their right to free assembly. And, most certainly (as

10

argued above), they exacerbated the fighting by pushing Plaintiffs (and others) back into the maw of their attackers. If a third party is bent on denying citizens the use of a public area for a protest, there are three potential government responses: 1) create a plan that prevents the third party from blocking and attacking protesting citizens 2) failing that, to use the heavily equipped police forces at its disposal to separate the two sides or 3) do nothing and allow protesting citizens to attempt to deal with "third party" on their own.

Plaintiffs contend that Defendants did not take any of the above-mentioned legal courses of action, and instead, engineered a situation where protestors had to either fight their way through armed "third party" opposition, or accede to the denial of their rights. The government's actions were tantamount to an authorization for any private gang to seize control of any public area whenever they disapprove of other citizens' attempts to use that area for a protest. If that is the case, the Court should put Plaintiffs--and indeed, all US citizens--on notice that free speech and assembly are no longer in force.

### 4. DEFENDANTS CANNOT CLAIM QUALIFIED IMMUNITY

As described previously, Defendants' state action created a situation that deprived Plaintiffs of their right to peaceably assemble and freely express themselves. Plaintiffs' right to do so was clearly established before the rally by the District Court's injunction order, which stated that Plaintiffs and other UTR demonstrators unquestionably had a first-amendment right to assemble in Lee Park on the morning of August 12, 2017. Defendants, in disregard of that order, persisted in their plan to restrict plaintiffs' civil rights by creating circumstances in the park that made peaceful demonstration impossible.

Therefore defendants cannot claim qualified immunity because they intentionally deprived plaintiffs of civil rights in contravention of an order clearly establishing those rights.

5. RICO CLAIM

The actions of Defendants indicate that they had a firm intention of making sure Plaintiffs and other protestors would not be able to exercise their rights. Defendants had knowledge of the inevitably criminal acts that Antifa would commit. The Heaphy Report details Charlottesville's experience of an Antifa riot mere weeks before UTR. Yet not only did Defendants do nothing to prevent Antifa criminality, but they actively interfered in the planning process of lower-level agencies, thereby guaranteeing that Plaintiffs rights would be denied. For example, City Defendants were well appraised that Antifa violence was likely and that moving the rally from Lee Park to McIntyre Park would make planning more difficult, cf. Heaphy pp. 81-82:

"On July 31, Mayor Signer called for a closed session of City Council to take place on August 2, at which time Council could receive legal advice on the issue. In anticipation that a decision to move the event would instigate litigation by Kessler—and, in part, due to Signer's concern that the City Attorney's approach to this issue was "conservative"—Signer suggested the City hire outside counsel. City staff agreed and hired the firm of Boies Schiller Flexner LLP (BSF) to help evaluate the potential legality of moving the event. During the closed session on August 2, Council received legal advice from the City Attorney, lawyers from BSF, and an attorney from the Thomas Jefferson Center for the Protection of Free Expression. The consensus of this advice was that a

decision to move the permit away from Emancipation Park would require evidence of a "specific, credible threat" to public safety posed by rally organizers. Council was told that generalized threats of violence, promises to use violence in self-defense, and information that counter-protesters planned to use violence to quell a permit holder's speech were insufficient bases to move the event from Emancipation Park."

Moreover, as Plaintiffs have alleged, after the declaration of unlawful assembly, Defendants treated Antifa differently from how they treated Plaintiffs and other UTR protestors (cf. complaint paragraphs 30, 48). While Defendants aggressively removed UTR protestors from downtown Charlottesville, they did not take similar actions against Antifa and other counter-protestors (cf complaint, paragraph 49). This blatant disparity of treatment is further indication that Defendants were acting in concert with Antifa.

Finally, contrary to Defendants' assertions, Plaintiffs have alleged damage to their property (complaint, paragraph 109): "Plaintiffs have been injured in their businesses and property in that: Plaintiffs were deprived of their right to speak freely, were harassed, assaulted, and insulted, were placed in danger of severe bodily injury, were deprived of their constitutionally protected right to assemble, were made subject to invasion of privacy, and were deprived their rights under their rightfully obtained permit to protest."

## II. CONCLUSION

Defendants want to have it both ways. They claim that they had no responsibility to protect UTR protestors from third-party interference, while at the same time, they attempt to justify their actions to eject Plaintiffs from a permitted assembly on the basis of third-party interference. The Defendants' argument seeks to relieve the government and its agents of any responsibility to protect citizens in the exercise of their rights, and to treat any attempts on the part of citizens to protect their rights from hostile third parties as instances of "mutual combat." According to their reasoning, citizens have no recourse to governmental aid in the event third parties interfere with their attempts at exercising free speech and assembly, and the government can use citizens' attempts to hold their ground in the face of an attack by third parties as a pretext to deny them the exercise of their rights. What are citizens to do? If Defendants' are correct, citizens' only option is to not exercise their rights, which means that they do not really have any rights at all.

For the foregoing reasons, Plaintiffs respectfully request that this Court DENY the Defendants' motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Plaintiffs also request an in-person hearing in the event that this Court wishes to grant any of the Defendants' motions to dismiss.

In the alternative, if this Honorable Court should grant Defendants' motions to dismiss for failure to state a claim, then Plaintiffs request that the Court clarify what actions Plaintiffs may take to exercise their rights to free speech and assembly in the event that a well organized and aggressive "third party" seeks to hinder Plaintiffs from engaging

in free speech or assembly. Plaintiffs also request that this Honorable court affirm their rights to speak and assemble in Charlottesville.

Dated: 20 June, 2020 Respectfully Submitted,

_____
Gregory Conte
P.O. Box 3874
Gaithersburg, MD 20885
Pro Se

_____
Warren Balogh
P.O. Box 6037
Pittsburgh, PA 15211
Pro Se

# CERTIFICATE

I hereby certify that on the 20th day of June, 2020, I sent the foregoing to the Clerk of the Court by first class mail, which will send notification of such filing to all counsel of record.

I hereby certify that I have mailed by United States Postal Service the document to the following:

Robert B. McEntee, III (VSB No. 89390),
Erin R. McNeill (VA Bar No. 78816),
and Madeline M. Gibson (VSB No. 87561)
Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
(Representing the Commonwealth, Virginia State Police, Terence McAuliffe, Brian Joseph Moran, Steven Flaherty, and Becky Crannis-Curl)

Richard H. Milnor VSB 14277
414 Park Street
Charlottesville, VA 22902 4349770191
(Representing the City of Charlottesville and Charlottesville Police Department)

David P. Corrigan (VSB No. 26341)
and Melissa Y. York (VSB No. 77493)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
(representing Al Thomas, Jr. and Wes Bellamy)

Rosalie Pemberton Fessier VSB 39030
Timberlake Smith
25 North Central Avenue
P.O. Box 108 Staunton VA 24402
(Representing Wes Bellamy)

Dated June 20, 2020.

Respectfully Submitted,

*Gregory Conte*
Gregory Conte

*Warren Balogh*
Warren Balogh

17